FILED

2021 Mar-23  AM 08:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| HERBERT COOPER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No.: 2:18-cv-01539-MHH |
| | ) |
| CITY OF ADAMSVILLE, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION & ORDER

In this employment action, Herbert Cooper seeks damages from the City of Adamsville because he says that when it fired him, the City violated the Americans with Disabilities Act and the Age Discrimination in Employment Act. The City has asked the Court to enter judgment in its favor on Mr. Cooper's claims. (Doc. 26). This opinion resolves the City's motion for summary judgment. The opinion begins with a discussion of the standard that a district court uses to evaluate motions for summary judgment. Then, consistent with the summary judgment standard, the Court identifies the evidence that the parties have submitted, describing the evidence in the light most favorable to Mr. Cooper. Next, the Court discusses the general analytical framework for employment discrimination claims under the ADA and the ADEA. Finally, the Court examines the parties' evidence under that framework as

1

it relates to Mr. Cooper's ADA and ADEA discrimination claims, and the Court considers Mr. Cooper's ADA medical inquiry claim.

## I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute as to a material fact precluding summary judgment, the party opposing summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

"A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of certain evidence, the court

cannot make credibility determinations; that is the work of jurors. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in the non-moving party's favor. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). Accordingly, the Court presents the summary judgment evidence in the light most favorable to Mr. Cooper and draws all inferences in his favor.

## II.

### Mr. Cooper's Employment with the City of Adamsville

In 1992, the City of Adamsville hired Mr. Cooper as a carpenter in the Public Works Department. (Doc. 25-1, p. 23). Mr. Cooper spent approximately 15 years working in the department as a carpenter and heavy equipment operator. (Doc. 25-1, pp. 23–24). Mr. Cooper left the City and worked for Jefferson County for a few years. (Doc. 25-1, pp. 25–26). In 2010, Mr. Cooper returned to work for the City as a carpenter and machine operator and became a public works supervisor. As a supervisor, Mr. Cooper was responsible for coordinating his department's day-to-day operations, and he continued to handle carpentry and building projects for the City. (Doc. 25-1, pp. 25–27; Doc. 25-2, pp. 64, 67–68; Doc. 25-1, p. 48). In a review dated November 14, 2016, Mr. Cooper's supervisor at the time, Ron Moseley,

3

commented that Mr. Cooper was his "right hand man. His knowledge in Public Work matters is invaluable." (Doc. 25-2, p. 152).

In 2010, after Mr. Cooper suffered a heart attack, his doctor prescribed blood pressure medication, and in 2013, Mr. Cooper's doctor prescribed thyroid medication. After Mr. Cooper suffered a back injury at work in 2016, his physician gave him a prescription for Norco, a narcotic used to relieve moderate to severe pain. (Doc. 25-1, p. 31). Mr. Cooper took Norco on a regular basis, (Doc. 25-1, p. 31), but only at night, not during work hours, (Doc. 25-2, pp. 127–28). As he received each prescription, Mr. Cooper told his then-supervisor, John Cameron, about his medication. (Doc. 25-1, pp. 32–34).[1]

The City's policy concerning use of prescription drugs during work hours provides:

> In order to assure that employees can perform their jobs safely, employees using prescription drugs according to a licensed prescriber's instructions or using over-the-counter drugs for medicinal purposes must, in the event such drugs could impair their physical, mental, emotional, or other faculties, notify their supervisor or department head prior to reporting to work. Failure to do is in violation of this policy and is cause for disciplinary action, including termination. If the Department Head determines this use of medication may have a negative effect on the employee's job performance, the Department Head may, in conjunction with the Human Resources Director, require the employee to utilize earned sick time and/or an unpaid leave of absence.

---

[1] Mr. Cooper spoke in general terms about his health, back pain, and doctor visits with Mr. Moseley, but Mr. Cooper did not discuss with Mr. Moseley the specific nature of his condition or prescriptions. (Doc. 25-2, pp. 78–80).

(Doc. 25-9, p. 46, § E2(d)).  Janna Gardner, the City of Adamsville Clerk and Human Resources Director, testified that under the policy, an employee had to report prescription drug use only if the medication would impair the employee's work. (Doc. 25-3, pp. 31, 58).  Ms. Gardner explained that, on occasion, she had directed City employees to use the Release of Liability for Medical Evaluation Form at the back of the City's employee handbook to disclose new prescription medication. (Doc. 25-3, pp. 117–19).  The last line on that form asks the individual completing the release to "Please list all current medications being taken."  (Doc. 25-9, p. 53). Ms. Gardner testified that she did not train City employees to use the release form to report prescription medication use.  (Doc. 25-3, pp. 117–19).

## Public Works Department Drug Testing

In 2017, the City became concerned that City employees might be using illegal drugs.  On December 19, 2017, a City employee told Mr. Moseley that on several occasions, he had seen a City vehicle outside a rumored drug house.  (Doc. 25-2, pp. 90, 103–05).  Other City employees acknowledged to Mr. Moseley that one of their co-workers had stopped at the house on several occasions.  (Doc. 25-2, pp. 102-08).  Using illegal drugs or legal drugs without a valid prescription during work hours would violate the following provisions in the City's employee handbook:

> The possession, use, transfer, manufacture or sale of alcohol, illegal drugs, or legal drugs without a valid prescription from a licensed medical or dental practitioner, during working time, on City property

5

or while operating or riding in a City-owned, leased or rented vehicle, or any vehicles being used for City business, is prohibited.  Obviously, this does not prevent City employees from possessing or transporting alcohol or illegal drugs as part of their job duties (i.e., a law enforcement officer who transports seized drugs).

\*      \*      \*

Reporting for duty or working with drugs present in the body or while affected by alcohol will be handled under disciplinary procedures.  This prohibition includes prescription drugs, unless the employee has a current legal prescription and a valid medical reason for using such prescription drug.

(Doc. 25-9, p. 46, §§ E2(a), E2(c)).

Mr. Moseley became concerned about potential drug-related behavior in the Public Works Department and shared his concern with Mayor Pam Palmer.  (Doc. 25-2, p. 110).  Mayor Palmer ordered drug testing for the department's employees, (Doc. 25-4, pp. 206–07), but the City did not comply with its handbook when ordering the drug tests.[2]  Mayor Palmer and Mr. Moseley did not fill out a drug

---

[2] Document 25-4 is the transcript of the City's 30(b)(6) deposition.  (Doc. 25-4, pp. 2, 26).  The City designated Mayor Palmer as its 30(b)(6) representative.  Mr. Cooper has asked the Court to sanction the City because during the 30(b)(6) deposition, Mayor Palmer "repeatedly testified that she had done nothing to prepare fot [*sic*] the deposition and could not testify to the vast majority of the topics that were disclosed more than five months earlier."  (Doc. 21, p. 2).  Mayor Palmer "also refused to testify verbally concerning many topics . . . ."  (Doc. 21, p. 3).

The Court has reviewed Mayor Palmer's 30(b)(6) deposition testimony and confirmed that she was unprepared to address many of the topics in Mr. Cooper's 30(b)(6) deposition notice.  By way of example, when asked about the termination process for non-probationary employees, Mayor Palmer answered, "That, you would have to ask the human resources director everything they do."  (Doc. 25-4, p. 23).  When asked whether there is a lead decision maker when the City fires an employee, Mayor Palmer answered, "Human resources directs that type of thing."  (Doc. 25-4, p. 26).  When asked what happens after the human resources team investigates an employee, Mayor Palmer answered, "You would have to ask the human resources director.  I believe that they make their determinations, and sometimes I'm involved, sometimes I'm not."  (Doc. 25-4, p. 27).  When asked about her preparations for the 30(b)(6) deposition, Mayor Palmer indicated she did not

testing form, (Doc. 25-9, pp. 55-56), for each employee and did not review important factors warranting a test before ordering the drug tests.  (Doc. 25-3, pp. 120, 123–

---

review the City personnel handbook, (Doc. 25-4, p. 30), did not review City policies or procedures, (Doc. 25-4, p. 30), did not prepare to testify about the policies, processes, rules, regulations, appeal rights, and procedures concerning employee termination, (Doc. 25-4, p. 30), was unprepared to discuss the progressive discipline policies and document requirements required for termination, (Doc. 25-4, pp. 30–31), did not prepare to testify about policies and procedures regarding investigations of complaints of discrimination, (Doc. 25-4, p. 32), was unprepared to testify about how the City sets salaries, (Doc. 25-4, pp. 32–33), could not testify as to the number of City employees, (Doc. 25-4, p. 33), could not testify to Mr. Cooper's rate of pay or bonuses, (Doc. 25-4, p. 33), and could not testify to Mr. Cooper's earnings, (Doc. 25-4, p. 34).  Significantly, Mayor Palmer could not testify to the development and implementation of the City's policies and procedures prohibiting workplace discrimination, (Doc. 25-4, p. 35), and she could not testify about the City's policy regarding reporting prescription drug usage, (Doc. 25-4, p. 35).

Mayor Palmer testified since Mr. Cooper noticed the 30(b)(6) deposition on May 31, 2019, she had "[a]bsolutely not" done anything to prepare for the deposition."  (Doc. 25-4, p. 69).  She testified "I'm a person. I'm not the City."  (Doc. 25-4, p. 100).

The City's attorney, Timothy Donahue, stated that Mayor Palmer could testify to some of the topics in the notice of deposition but not all of them.  (Doc. 25-4, p. 55).  He explained:

> Mayor Palmer is here today to answer the questions that she's capable of answering and that she's been through.  She said she's capable of answering some of the areas of inquiry if shown the proper policies and procedures of her handbook that you already have from Adamsville. Some of the -- some of the topics she is not able to answer, and we have Janna Gardner here as head of HR and city clerk who is able to supplement and complete the areas of inquiry that are on the Deposition Notice.

(Doc. 25-4, p. 58).  Mr. Donahue also stated there were certain questions "no one in the City . . . can answer . . . other than Janna Gardner."  (Doc. 25-4, p. 89).  He added:  "[Mayor Palmer] is your 30(b)(6) witness. No one in the city is going to know all the -- all the things that you contain with your Deposition Notice. Not one person is going to be able to do that."  (Doc. 25-4, p. 90).  Mr. Donahue refused to designate Ms. Gardner as an additional 30(b)(6) representative for the City of Adamsville.  (Doc. 25-4, p. 90).

Based on Mayor Palmer's lack of preparation to serve as a 30(b)(6) representative for the City, the Court grants Mr. Cooper's motion for sanctions.  (Doc. 21).  Because some of Mr. Cooper's requested relief is now moot, the Court will reserve its determination of the precise award of sanctions for the pretrial conference, at which time counsel shall be expected to discuss the matter. The clerk shall please term Doc. 21.

24).  These factors include whether the employee's actions were calm, threating, erratic, fighting, or hostile; whether the employee was resisting, using profanity, hyperactive, or drowsy; whether the employee had bloodshot, closed, dilated, droopy, glassy, or watery eyes; whether the employee had a flush, pale, or sweaty face; whether the employee was partially dressed, dirty, unruly, or had an odor; whether the employee had bodily excrement stains on his clothing; whether the employee had a faint or pervasive alcoholic odor; and whether the employee smelled of marijuana.  (Doc. 25-3, pp. 124–25; Doc. 25-9, pp. 55–56).

The test results of four employees -- Sammy Owens, Herbert Cooper, Shane Long, and Jimmy Brown -- were positive.  (Doc. 25-3, p. 96).  Mr. Owens and Mr. Long were fired immediately.  (Doc. 25-3, p. 108; Doc. 25-2, p. 230).[3]

The City ruled Mr. Brown's test, which came back positive for methamphetamine, a false positive after Mr. Brown submitted his prescription for Metformin, and the City consulted with a pharmacist.  (Doc. 25-3, pp. 96, 108–10). Ms. Gardner testified that she had been told in some training that other city clerks were having issues with methamphetamine false positives, which is why she followed up with a pharmacist "to get some confirmation on the possibility" of a false positive.  (Doc. 25-3, pp. 108–09).  Mr. Brown had previously told Mr. Mosely

---

[3] Mr. Long tested positive for marijuana.  (Doc. 25-3, pp. 155, 230).  The record does not show what drug or drugs Mr. Owens had in his system, but Mr. Owens was in his probationary period, and he was terminated for that reason.  (Doc. 25-3, p. 107).

about the prescription but had not submitted information regarding his prescription in writing to the City. (Doc. 29-1, pp. 29–30; Doc. 25-3, p. 117). The record contains no evidence indicating that the City disciplined Mr. Brown for not providing the City with written notice of his prescription, and in response to Mr. Cooper's interrogatories, the City stated that no employee had been disciplined but not terminated "for the same or similar reason used to discipline and terminate" Mr. Cooper. (Doc. 25-3, p. 235, ¶ 3).

Mr. Cooper tested positive for opiates, and the City began an investigation into the positive drug test. (Doc. 25-8, p. 2; Doc. 25-1, pp. 40; Doc. 25-3, pp. 107–08).[4] On December 20, 2017, Mr. Cooper gave Ms. Gardner a copy of his prescriptions. (Doc. 25-1, p. 44). That same day, Ms. Gardner issued Mr. Cooper a written warning for violating the City's drug policy (Doc. 25-2, pp. 141–42; Doc. 25-5, p. 2; Doc. 25-3, p. 231). The warning states:

> Employee tested positive for Opiates on a drug screen. Employee presented a medical prescription for Hydrocodone after the test.
>
> Page 44: Section XVI—Substance Abuse; E, 2, d; "employees using prescription drugs . . . notify their supervisor or department head prior to reporting to work. Employee has been advised he must be drug free for 24 hours prior to working.

---

[4] When asked if she had learned about similar false positives with respect to opiates, Ms. Gardner did not clearly answer the question. (Doc. 25-3, pp. 110–14).

(Doc. 25-3, p. 231).   And on that same day, the City placed Mr. Cooper on administrative leave with pay while the City continued its investigation.  (Doc. 25-1, p. 46; Doc. 25-3, p. 108; Doc. 31-1, p. 2).

At Ms. Gardener's request, on December 28, 2017, Mr. Cooper obtained a report from Southside Pain Specialists and delivered the report to Ms. Gardner. (Doc. 25-3, pp. 44-45, 182-83, 233).   The report, signed by Dr. Ross Lumsden, states:

> To Whom It May Concern,
>
> Herbert Cooper has been a patient of mine since August 2016.  I treat him for his severe pain and have diagnosed him with degeneration of cervical intervertebral disc and lumbosacral spondylosis without myelopathy.   Due to his condition, I treat him with medication management.   Mr. Cooper is taking Norco 10 mg-235 mg tablet, and has consistently taken this medication since he started coming to my office.
>
> Although I do not see him at work, there is no reason for me to believe that this medication causes him to underperform in the workplace.  He does not report any irregular side effects from the medication.
>
> Please contact my office . . . should you have any questions regarding this matter.

(Doc. 25-3, p. 233).

### Mr. Cooper's Termination

The day after Mr. Cooper provided Dr. Lumsden's letter to Ms. Gardner, Ms. Gardner interviewed Public Works Department employees concerning Mr. Cooper's conduct.  (Doc. 25-3, pp. 146–47, 171, 183, 228-29).  She reached three conclusions. First, Mr. Cooper had alcohol in a City vehicle on October 31, 2017.  (Doc. 25-3, pp. 172, 232).  Second, using a City radio, Mr. Cooper had asked his subordinates to buy drugs for him. (Doc. 25-3, pp. 176–77, 232).  Third, Mr. Cooper knew his employees were buying drugs while they were on duty at work and did not take corrective action.  (Doc. 25-3, pp. 177, 232).  Before she issued a termination notice to Mr. Cooper, Ms. Gardner did not discuss her findings with him.  (Doc. 25-3, pp. 175–78).

Mr. Cooper contests Ms. Gardner's findings.  He maintains that he did not buy illegal drugs while he was working for the City and that he was not aware that employees in the Public Works Department were using illegal drugs.  (Doc. 25-1, pp. 44, 49).  Mr. Cooper asserts that he did not consume alcohol on the job and that he did not give alcohol to another employee on October 31, 2017.  (Doc. 25-1, pp. 49–50).  He acknowledges that he sometimes had alcohol containers in his City vehicle but only to dispose of them after he removed them from City parks.  (Doc. 25-1, pp. 49–50).

On January 2, 2018, the City fired Mr. Cooper.  (Doc. 25-6, p. 2).  As grounds for his termination, the City stated that Mr. Cooper violated the City's drug policy by having alcohol in his truck on October 31, 2017; that Mr. Cooper acted dishonestly by using a subordinate to buy illegal drugs "during working time"; and that Mr. Cooper violated City administrative regulations because he did not report or reprimand city employees who he knew were buying and using illegal drugs. (Doc. 25-3, p. 232; Doc. 25-6, p. 2).  Mr. Cooper refused to sign his termination form.  (Doc. 25-6, p. 2; *see also* Doc 25-1, p. 55; Doc. 25-3, p. 232).

Mr. Cooper testified that Ms. Gardner told him Mayor Palmer had said the City had no choice but to terminate him due to the length of time he had been taking his medication.  (Doc. 25-1, p. 47).  Mayor Palmer testified that the City terminated Mr. Cooper's employment because he did not provide notice of his medications, was involved in radio communication regarding a drug purchase, failed a drug test, and admitted to taking his medication on the way to the drug test.  (Doc. 25-4, pp. 223–24).  Mr. Moseley remembers two reasons for Mr. Cooper's termination:  his failure to disclose his prescription medication and his involvement in an alcohol incident. (Doc. 25-2, pp. 143–44).

After the City fired Mr. Cooper, the City promoted Mr. Brown to the position of public works supervisor, the role Mr. Cooper had held.  (Doc. 25-3, p. 84).  Mr. Brown is approximately seven years younger than Mr. Cooper, (Doc. 25-1, p. 18; Doc. 29-1, p. 18), and does not have a disability.  (Doc. 29-1, p. 27).[5]

### Mr. Cooper's Lawsuit

Mr. Cooper filed a charge of discrimination with the Equal Employment Opportunity Commission in which he provided a narrative of the facts discussed above and alleged that the City terminated him because of his age and disability. (Doc. 1-1, pp. 2–3).  After the EEOC proceeding concluded, Mr. Cooper brought this action.

### III.

In general, a plaintiff may attempt to establish a claim of employment discrimination through direct evidence, circumstantial evidence, or statistical evidence.  *Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999).[6]  Mr. Cooper relies on circumstantial evidence of discrimination.

---

[5] Mr. Cooper's birthday is February 9, 1960.  (Doc. 25-1, p. 18).  Mr. Brown was born in 1967. (Doc. 29-1, p. 15).  The Court has not located Mr. Brown's exact birthday in the record.

[6] *See also* Dallan F. Flake, *When Should Employers be Liable for Factoring Biased Customer Feedback Into Employment Decisions?*, 102 MINN. L. REV. 2169, 2192 (2018) ("Because direct evidence of discrimination is rare, plaintiffs ordinarily attempt to prove their claims through circumstantial evidence . . . ."); Bina Nayee, Note, *Where Breaking Glass Ceilings Leads to Glass*

When evaluating an employment discrimination claim supported by circumstantial evidence, a district court may use "the now-familiar framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed 2d 207 (1981)." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527 (11th Cir. 1997); *see also Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255 (11th Cir. 2007) (applying *McDonnell Douglas* framework in ADA case); *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013) (applying *McDonnell Douglas* framework in ADEA case).[7] Under the *McDonnell Douglas* framework, a plaintiff must establish a prima facie case of discrimination to "create[] a presumption that the employer unlawfully discriminated against the employee." *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254). If the plaintiff establishes a prima facie case, then the burden shifts to the employer to identify a legitimate, nondiscriminatory reason for its employment action. *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1221

---

*Walls: Gender-Disparate Managerial Decision-Making Power and Authority*, 87 FORDHAM L. REV. 371, 398 n.204 (2018) ("It is rare for plaintiffs to support their claims with direct evidence because overt discrimination itself is much rarer.").

[7] "Mixed motive" claims, which sometimes arise in Title VII cases, are not recognized by the Eleventh Circuit Court of Appeals in ADA or in ADEA discrimination cases. *See, e.g.*, *Barber v. Cellco P'ship*, 808 Fed. Appx. 929, 934–35 (11th Cir. 2020) ("[N]either the statutory text nor binding case law demonstrate" that a mixed motive causation analysis applies in ADA discrimination claims); *Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010) ("[T]he Supreme Court has excluded the whole idea of a 'mixed motive' ADEA claim . . . .").

(11th Cir. 2019) (*en banc*).  If the defendant carries its light burden, then the burden returns to the plaintiff to show that the employer's legitimate, nondiscriminatory reason was pretext for discrimination.  *Lewis*, 918 F.3d at 1221.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Burdine*, 450 U.S. at 253.

The *McDonnell Douglas* framework is not "the only way to use circumstantial evidence to survive a motion for summary judgment" in employment discrimination cases.  *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012).  "If a plaintiff 'presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent,' []he 'will always survive summary judgment.'"  *Chapter 7 Trustee*, 683 F.3d at 1255 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)); *see also Lewis*, 918 F.3d at 1220 n.6.  A plaintiff may survive summary judgment by identifying a convincing mosaic of circumstantial evidence "that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual."  *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d

729, 733–34 (7th Cir. 2011)).  No matter the form, "so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper."  *Lockheed-Martin Corp.*, 644 F.3d at 1328; *see also Sims*, 704 F.3d at 1333 (applying convincing mosaic standard to ADEA claims).

## IV.

Under the ADA, no employer "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To make out a prima facie case of ADA discrimination under the *McDonnell Douglas* framework, Mr. Cooper must demonstrate that when the City fired him, he had a disability, he was a qualified individual, and he was subjected to unlawful discrimination because of his disability.  *United States Equal Opportunity Employment Comm'n v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1343 (11th Cir. 2016) (citing *Holly*, 492 F.3d at 1255).[8]

---

[8] Under the ADA, "disability" is defined as (1) "a physical or mental impairment that substantially limits one or more major life activities of [an] individual"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment."  42 U.S.C. § 12102(1).  The ADA provides that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  The ADA provides that an individual is "regarded as" having a disability "if the

The City does not challenge Mr. Cooper's ability to satisfy the first two elements of his prima facie case.  Mr. Cooper had a back injury, and the injury caused him chronic pain which limited his ability to walk, sleep, and lift objects.  He took Norco to relieve the pain.  (Doc. 25-1, p. 31; Doc. 25-3, p. 233).  Mr. Cooper's injury and its resulting limitations constitute a disability under the ADA for purposes of summary judgment.  The City fired Mr. Cooper even though he was qualified to perform the essential functions of his job.  Indeed, Mr. Cooper was Mr. Moseley's "right hand man."

To establish that the City discriminated against him because of his disability, Mr. Cooper explains that the City fired him after an investigation prompted by his positive drug test, which showed that Mr. Cooper had opiates in his system.  (Doc. 25-3, pp. 107–08, 223; Doc. 25-8, p. 2).  The opiate was the Norco that Dr. Lumsden had prescribed for Mr. Cooper's back pain in August of 2016 and that Mr. Cooper had used without side effects or work incidents from August 2016 until his

---

individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A).  An individual cannot be "regarded as" disabled based on a "transitory or minor" impairment, which the ADA defines as "an impairment with an actual or expected duration of 6 months or less."  42 U.S.C. § 12102(3)(B).

A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  An adverse employment action consists of actions "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee."  42 U.S.C. § 12112(b)(1).

termination in January of 2018.  Though Mr. Cooper reported his Norco prescription to his supervisor, Mr. Cameron, and though Mr. Cooper produced his prescription the day after his positive drug test, the day after his positive drug test, Ms. Gardner cited him for violation of Section E2(d) of the City's Personnel Policy, the provision that requires City employees to "notify their supervisor or department head" when they are using prescription drugs, and "such drugs could impair their physical, mental, emotional, or other faculties . . .," (Doc. 25-9, p. 46, § E2(d)).

Ms. Gardner intimated in her deposition that Mr. Cooper should have provided written notice of his prescription, but the City's policy does not require written notice, the form that Ms. Gardner testified that employees could use to provide written notice is the City's Release of Liability for Medical Evaluation Form at the back of the City's employee handbook, and Ms. Gardner testified that employees are not trained to use that form to disclose prescription medication.  (Doc. 25-3, pp. 117–19).  Mr. Brown tested positive for methamphetamine on the same day that Mr. Cooper tested positive for opiates and was returned to work without a warning even though he had notified of his supervisor of his prescription only verbally and had not provided written notification to the City of his Metformin prescription.  (Doc. 29-1, pp. 29–30).[9]  Viewed in the light most favorable to Mr.

---

[9] METFORMIN ORAL, WEBMD, https://www.webmd.com/drugs/2/drug-11285-7061/metformin-oral/metformin-oral/details ("Metformin is used with a proper diet and exercise program and

Cooper, this evidence of disparate treatment suffices to establish the final element of Mr. Cooper's prima facie case.

The City has provided three reasons for firing Mr. Cooper. First, the City says it fired Mr. Cooper because he "was seen with alcohol in a City vehicle on the night of October 31, 2017, which he gave to another city employee." (Doc. 25-6, p. 2). According to the City, this conduct violated the City's drug policy. (Doc. 25-6, p. 2). Courts have recognized an employee's violation of an employer's drug policy as a legitimate, nondiscriminatory basis for the employee's termination. *See, e.g., Connelly v. WellStar Health System, Inc.*, 758 Fed. Appx. 825, 829–30 (11th Cir. 2019) (employer may legitimately fire employee who has drugs in her system in violation of company drug use policy).

Second, the City says it fired Mr. Cooper because of his "dishonesty as related to job duties or use of official position for personal advantages; Investigation shows [Mr. Cooper] used subordinate to purchase illegal drugs during work time." (Doc. 25-6, p. 2). Courts have recognized dishonesty as a legitimate, nondiscriminatory reason for termination. *See, e.g.*, *Tiggs-Vaughn v. Tuscaloosa Housing Auth.*, 385 Fed. Appx. 919, 921 (11th Cir. 2010) (firing employee for dishonesty is legitimate, nondiscriminatory reason for termination).

---

possibly with other medications to control high blood sugar. It is used in patients with type 2 diabetes.") (last visited Mar. 17, 2021).

Finally, the City says it fired Mr. Cooper for a "serious violation of City administrative regulations, department rules, etc." because "[a]s a supervisor, Mr. Cooper failed to properly supervise department employees when he became aware of their purchase and use of illegal drugs and failed to reprimand or report them." (Doc. 25-6). Failure of supervisory responsibility is a legitimate basis for termination. *See, e.g.*, *Johnson v. Boardman Petroleum, Inc.*, 923 F. Supp. 1563, 1569 (S.D. Ga. 1996) (employee's "failure to investigate and remedy the cash shortages in three of the eight stores which she supervised" was a legitimate, nondiscriminatory reason for termination).

The City's stated reasons for firing Mr. Cooper are facially legitimate and nondiscriminatory. Therefore, to overcome the City's summary judgment motion, Mr. Cooper must identify a genuine evidentiary dispute as to whether the City's stated reasons are a sham designed to cover a discriminatory purpose. Mr. Cooper has offered several types of circumstantial evidence to meet his burden.

For starters, "[a]n employer's inconsistent or 'shifting' reasons for an employment action may constitute evidence that the employer's proffered reason for the challenged employment action is not credible." *Rodriguez v. Cargo Airport Services USA, LLC*, 648 Fed. Appx. 986, 991 (11th Cir. 2016); *see also Landolfi v. City of Melbourne, Fla.*, 515 Fed. Appx. 832, 835 (11th Cir. 2013) ("We have held that an employer's 'shifting reasons' permitted the jury to conclude that its

20

justifications for its decisions were unworthy of credence, thereby allowing it to infer discrimination.") (citing *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194-95 (11th Cir. 2004); *Bechtel Const. Co. v. Sec'y of Labor*, 50 F.3d 926, 928-31, 934-35 (11th Cir. 1995)).   The three grounds for termination that the City identified in Mr. Cooper's termination notice are not the only reasons that the City has given for firing Mr. Cooper.   Mayor Palmer reported that the City fired Mr. Cooper because he failed to provide notice of his medications, was involved in radio communication regarding a drug purchase, failed a drug test, and admitted to taking his medication on the way to the drug test.  (Doc. 25-4, pp. 223–24).[10]  Mr. Cooper testified that Ms. Gardner told him that the City terminated his employment because Mayor Palmer said the City had no choice but to terminate him because he "he had been taking [Norco] that long."  (Doc. 25-1, p. 47).   Mr. Mosley testified that Ms. Gardner told him that the City terminated Mr. Cooper because Mr. Cooper did not report his prescription medication and because of an incident involving alcohol. (Doc. 25-2, pp. 143-45).  The City's varying accounts of its reasons for terminating Mr. Cooper serve as circumstantial evidence of pretext.

---

[10] It is undisputed that Mayor Palmer ordered drug tests for the Public Works Department staff without following the procedures laid out in the City handbook.

So too does the City's contention that the City could terminate Mr. Cooper for failing to report his prescription for Norco.  First, Mr. Cooper testified that he told his supervisor, Mr. Cameron, that he had injured his back and that he was taking Norco, and the Court accepts that testimony for purposes of summary judgment. Because the evidence indicates that Mr. Cooper reported his prescription medication to the City, it appears that Mr. Cooper fulfilled his reporting obligation under the City's drug policy.   (Doc. 25-9, p. 46) (requiring employees to "notify their supervisor or department head" of prescription drug use).   Moreover, viewing the evidence in the light most favorable to Mr. Cooper, he did not have to report his prescription to the City under the plain language of the City's policy because Norco, which he took at night, could not, and did not, impair him at work.  (Doc. 25-2, pp. 61, 87–88; Doc. 25-9, p. 46).  And Ms. Gardner's testimony that employees had to report prescription drugs in writing finds no support in the City's written policy or in her training practices.   Jurors could conclude that Ms. Gardner fabricated the writing requirement.

But even if the evidence were to show that Mr. Cooper violated City policy by failing to report his prescription medications to the City in writing, then Mr. Brown also violated the City's drug policy.  Mr. Brown suffered no consequence and ultimately replaced Mr. Cooper.  Mr. Cooper, on the other hand, on December 20, 2017, one day after his positive test result, was given a written warning for

violating the City's drug policy and was placed on administrative leave because the prescription that he did not report in writing was an opiate.  (Doc. 25-3, p. 231).

Jurors could find that the City placed Mr. Cooper on administrative leave on the cusp of the Christmas and New Year's holiday week, and the City required Mr. Cooper to get a report from his doctor over the holidays to prove his medical history even though Mr. Cooper, like Mr. Brown, gave Ms. Gardner copies of his prescriptions.

At this point, the City had no information that suggested that Mr. Cooper was involved in, or was aware others in the Public Works Department were involved in, illegal drug activity, but the City still treated Mr. Cooper differently from Mr. Brown, even though both men had positive drug test results, both men reported their prescription medications to a supervisor verbally, and neither man reported his prescription drugs to the City in writing.

The reasons that the City provided for terminating Mr. Cooper after Ms. Gardner interviewed nine members of the City's Public Works Department on December 29, 2017 are problematic.  The City cited Mr. Cooper for a violation of "Section XVI, E, 2.a" of the City handbook because Mr. Cooper "was seen with alcohol in a City vehicle on the night of October 31, 2017 which he gave to another City employee."  (Doc. 25-3, p. 232).  Under the policy provision that Ms. Gardner cited, Mr. Cooper could have alcohol in a City truck if he was "possessing or

transporting alcohol or illegal drugs as part of [his] job duties . . . ."  (Doc. 25-9, p. 46).  Mr. Cooper testified that he would pick "up beer cans and beer bottles" and set them in the back of his truck until whenever he got back to the City shop to dispose of them properly.  (Doc. 25-1, pp. 49–50).  He stated that if he told Mr. Moseley that he had beer in his truck on the day of the City's Fall Festival, it was because he picked up cans in the park for disposal.  (Doc. 25-1, p. 52).  Mr. Cooper testified, "I did not drink on the job.  I worked with police at all times of the day and at any given time.  And if anybody had been drinking, they would have been tested."  (Doc. 25-1, p. 49).

The City also cited Mr. Cooper for using his official position for personal advantage because allegedly used a "subordinate to purchase illegal drugs during working time."  (Doc. 25-3, p. 232).  Most of the City employees who Ms. Gardner interviewed on Friday, December 29, 2017 reported rumors that Mr. Cooper was using two employees under his supervision to buy illegal drugs, but none of the employees who reported the rumors had personal knowledge of the purported drug buys.  (Doc. 25-3, pp. 228-29).  Two employees stated that they overheard conversations between the two subordinates concerning drug purchases for Mr. Cooper.  (Doc. 25-3, pp. 228-29).  After the New Year holiday weekend, the City terminated Mr. Cooper on January 2, 2018 without giving Mr. Cooper advanced written notice of the reasons for termination, consistent with the City's handbook.

(Doc. 25-9, p. 30).  The initial written warning that the City gave Mr. Cooper on December 20, 2017 did not satisfy the handbook requirement of advanced written notice because the reason for discipline in the December 20 disciplinary form did not match the reasons for discipline in the January 2, 2018 disciplinary form.  Mr. Cooper disputes the City's contention that he bought illegal drugs while employed by the City.  (Doc. 25-1, p. 49).  And Mr. Cooper testified that Mr. Owen never called him on the City's two-way radio to ask if he wanted pills when Mr. Owen stopped at the alleged drug house.  (Doc. 25-1, pp. 50–51).  Mr. Cooper's testimony creates a disputed issue of fact.  *Stein*, 881 F.3d at 857 ("[a] litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment.").  So does his testimony that he did not know that employees in the Public Works Department were using illegal drugs, the third justification for termination that the City listed in Mr. Cooper's January 2 disciplinary form.  (Doc. 25-1, p. 44; Doc. 25-3, p. 232).

Of course, an employee cannot establish pretext merely by showing "that the defendant's employment decisions were mistaken."  *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000).  Rather, an employee must demonstrate that the employment action was motivated by a protected characteristic – here, his disability. *Lee*, 226 F.3d at 1253; *see also Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999) (stating that courts "are not in the business of

adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.").  But Mr. Cooper challenges not only the validity of the reasons that the City listed in his written termination notice but also the way in which the City investigated (or failed to adequately investigate) rumors and changed its reasons for disciplinary action without giving Mr. Cooper proper notice and an opportunity to respond to the rumors on which the City based its termination decision.  Notably, Mr. Brown told Ms. Gardner that he had heard rumors that Mr. Cooper was using subordinate employees to buy drugs for him, (Doc. 25-2, p. 228), yet the City promoted Mr. Brown to Mr. Cooper's supervisor position even though Mr. Brown did not report the rumors.

Whether viewed under the *McDonnell Douglas* framework or the mosaic standard, the circumstantial evidence that Mr. Cooper has identified creates a genuine dispute of material fact as to whether Mr. Cooper's medication use, and thus his disability, was the true reason for his termination.  A jury must decide whether the City discriminated against Mr. Cooper because of his disability.

**V.**

The ADEA prohibits employers from discriminating against employees who are 40 years old or older.  29 U.S.C. §§ 623(a), 631(a).  The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  In *Gross v. FBL Fin. Servs., Inc.*, the United States Supreme Court held that a plaintiff bringing an ADEA disparate-treatment claim must prove by a preponderance of the evidence that age was the "but-for" cause of the adverse employment action.  557 U.S. 167, 180 (2009).

Mr. Cooper relies on circumstantial evidence to support his ADEA age discrimination claim.  To make out a prima facie case of age discrimination, a plaintiff must demonstrate that:  "(1) he was a member of the protected group between the age of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from which he was discharged." *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015).

Mr. Cooper has established a prima facie age discrimination case.  He was 57 years old when the City terminated him on January 2, 2018.  (Doc. 25-6, p. 2).  Mr. Cooper's replacement, Mr. Brown, is approximately seven years younger than Mr.

27

Cooper, making Mr. Brown "substantially younger" than Mr. Cooper for ADEA purposes. (Doc. 25-1, p. 18; Doc. 29-1, p. 15); *Liebman*, 808 F.3d at 1299 ("Weiss is seven years younger than Liebman, and this difference qualifies as substantially younger.").[11] As discussed previously, Mr. Cooper was qualified for the job from which he was discharged. Also, as discussed, the City has offered facially legitimate, nondiscriminatory reasons for Mr. Cooper's termination.

As discussed, reasonable jurors could conclude that the circumstantial evidence that Mr. Cooper has offered demonstrates that the City's stated reasons for firing him are pretextual, but he has not offered evidence that suggests that the City's real reason for terminating him was his age. The Eleventh Circuit Court of Appeals has pointed out that under the ADEA, "a contradiction of the employer's proffered reason for the termination of an employee is sometimes enough, when combined with other evidence, to allow a jury to find that the firing was the result of unlawful discrimination." *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1307 (11th Cir. 2012) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)). This is not one of those cases because there is no evidence the City held animus against Mr. Cooper based on his age.

---

[11] The Eleventh Circuit has held that a three-year difference in age is "legally significant for ADEA purposes." *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1003 (11th Cir. 1997).

"The burden of persuasion always remains on the plaintiff in an ADEA case to proffer evidence sufficient to permit a reasonable fact finder to conclude that the discriminatory animus was the 'but-for' cause of the adverse employment action." *Sims*, 704 F.3d at 1332 (citing *Gross*, 557 U.S. at 176).  In a review dated November 14, 2016, Mr. Moseley wrote that Mr. Cooper was his "right hand man.  His knowledge in Public Work matters is invaluable."  (Doc. 25-2, p. 152).  At the time, Mr. Cooper was 56 years old.  (Doc. 25-1, p. 18).  Mr. Mosley told Mr. Cooper that he was disappointed with the City's decision to terminate him, but he abided the decision.  (Doc. 25-2, p. 145-46).  There is no evidence that anyone in the City treated Mr. Cooper differently from another employee based on his age.

The lack of circumstantial evidence prevents Mr. Cooper from establishing the City acted with discriminatory intent.  *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1443 (11th Cir. 1985) ("The mere fact that one employee is replaced with another who is younger certainly does not, without more, give rise to an inference that age was even considered in the decision to dismiss . . . the first employee.").  Mr. Cooper's ADEA claim fails because a careful review of the record reveals no evidence that his age played a role, much less a determinative role, in the City's

decision to fire him.[12]   The Court will enter judgment in favor of the City on Mr. Cooper's ADEA claim.

## VI.

Under the ADA, employers may not inquire into "whether [an] employee is an individual with a disability or as to the nature or severity of [an employee's] disability, unless such . . . inquiry is shown to be job-related and consistent with business necessity."   42 U.S.C. § 12112(d)(4)(A).   "[A]n employer may 'make inquiries into the ability of an employee to perform job-related functions.'"   *Russell v. City of Mobile Police Dept.*, 552 Fed. Appx. 905, 906 (11th Cir. 2014) (quoting 42 U.S.C. § 12112(d)(4)(B)).

The Sixth Circuit Court of Appeals has stated:   "[o]bviously, asking an employee whether he is taking prescription drugs or medication . . . trigger[s] the ADA's . . . protections."   *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 254 (6th Cir. 2011).   And the Tenth Circuit Court of Appeals has "recognized that requiring disclosure of prescription drugs may violate § 12112(d)(4)(A)."   *Williams v. FedEx Corporate Services*, 849 F.3d 889, 901 (10th Cir. 2017) (citing *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1230 (10th Cir. 1997)).   But when an employee's use of prescription medication could impair the employee's ability to

---

[12] *See generally* Sandra F. Sperino, *Into the Weeds: Modern Discrimination Law*, 95 NOTRE DAME L. REV. 1077, 1117 (2020) (It is not true "that a worker always has enough evidence of discrimination to get to a jury by establishing pretext.").

perform his job safely, such as when the employee's job involves the operation of heavy machinery, an employer's inquiry into the employee's prescription drug use does not violate the ADA. *Parsons v. First Quality Retail Servs., LLC*, No. 5:10-CV-145 (CAR), 2012 WL 174829, at *7 (M.D. Ga. Jan. 20, 2012).

As written, the City's drug policy does not provide for impermissible medical inquiries. Instead, the policy requires employees taking legally prescribed drugs to report their prescriptions to the City if "such drugs could impair their physical, mental, emotional, or other faculties" and jeopardize the employees' abilities to perform their jobs safely. (Doc. 25-9, p. 46). Therefore, the City's written drug policy is limited to permissible inquiries that are job-related and consistent with business necessity. The Court grants the City's motion for summary judgment on Mr. Cooper's medical inquiry claim.

## CONCLUSION

Based on its analysis of the summary judgment evidence and the law that governs Mr. Cooper's claims against the City, the Court grants the City of Adamsville's motion for summary judgment with respect to Mr. Cooper's ADEA and ADA improper medical inquiry claims, and the Court denies the City's motion for summary judgment with respect to Mr. Cooper's ADA discrimination claim. As discussed in footnote 2, the Court grants Mr. Cooper's motion for sanctions. (Doc. 21). Counsel shall be prepared to discuss the appropriate remedy at the pretrial

conference, after which the Court will decide the appropriate sanctions.  By separate order, the Court will set Mr. Cooper's ADA discrimination claim for trial and will schedule a pretrial conference.

      **DONE** and **ORDERED** this March 22, 2021.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE